FIPPS VS M'GEHEE, et al.

*Touching certain requisites indispensable to the pro-*
*bate of a deed.*

*Concerning the title to lands originating under the*
*treaty of the 24th of March, 1832, between the*
*United States and the Creek tribe of Indians,* *

1. The act of 1812, which prescribes the mode in which the
   probate of deeds may be taken, sets out a form, which, in
   substance, must be pursued; and a deviation from the
   mode prescribed in the act, is ground of error.

2. The essentials required in a probate, under this statute,
   are, that the witness should swear,—to the subscription of
   all the parties, setting out their names; that the witnesses
   subscribed, in the presence of the maker of the deed, and
   in the presence of each other, and on the day and year
   named in the deed.

3. Where the probate of a deed only set forth,—that a sub-
   scribing witness appeared, and made oath, *that he saw the*
   *same signed, sealed and delivered, for the purposes therein*
   *mentioned, and that B. and H. signed the same, at the time*
   *said deed was executed, as witnesses,*—held defective, as
   omitting the essential requisites of the statute of 1812.

4. A grant for lands from certain persons of the Creek tribe
   of Indians, to whom the chiefs and head men had assign-
   ed the same, in pursuance of the treaty of [the 24th of
   March, 1832, will not support an action of ejectment; the

* The cases arising under rights acquired, or supposed to be acquired,
by virtue of the treaty between the United States and the Creek tribe of
Indians, of the 24th of March 1832, and the various constructions placed
upon the several provisions of that treaty,—together with the necessity of
having the treaty in a situation for frequent reference,—have induced the
reporter to publish the treaty, in *hæc verba*.

patent for the same not having issued, until after suit commenced.

5. *Semble,*—That if the assignees from the Creek tribe, under the provisions of the treaty of the 24th of March, 1832, had received the assignment, and had been located on the land; or if the land had been located, and designated as reserved for this purpose by the locating agent, and then assigned before the commencement of the suit:—under such a state of things, an inchoate legal title would have vested, which would have been perfected by a patent subsequently issued, and in view of which, the action could yet have been sustained.

---

ARTICLES OF A TREATY made at the city of Washington, between Lewis Cass, thereto specially authorised by the President of the United States, and the Creek tribe of Indians.

Article 1. The Creek tribe of Indians, cede to the United States, all their land East of the Mississippi river.

Article II. The United States engage to survey the said land, as soon as the same can be conveniently done, after the ratification of this treaty, and when the same is surveyed, to allow ninety principal Chiefs of the Creek tribe, to select one section each, and every other head of a Creek family, to select one half section each, which tracts shall be reserved from sale for their use, for the term of five years, unless sooner disposed of by them. A census of these persons shall be taken, under the direction of the President, and the selections shall be made so as to include the improvements of each person, within his selection, if the same can be so made, and if not, then all the persons belonging to the same town, entitled to selections, and who cannot make the same, so as to include their improvements, shall take them in one body in a proper form. And twenty selections shall be selected, under the

FIPPS vs M'GEHEE, et al.

In error to the Circuit Court of Benton county.

On the twenty-sixth day of April, eighteen hun·dred and thirty-six, William M'Gehee and John H. Thomas, sued out their writ of trespass to try title against the plaintiff in error, to recover possession of the South-west quarter of section twenty-six, township fourteen, range eight, East,—of the Coosa land district, containing one hundred and sixty acres, more or less, lying in Benton county.

On this writ, they declared at spring term, eigh-

---

direction of the President, for the orphan children of the Creeks, and divided and retained or sold for their benefit as the President may direct. Provided however, that no selections or locations under this treaty, shall be so made as to include the agency reserve.

Article III. These tracts may be conveyed by the persons selecting the same, to any other persons for a fair consideration, in such manner as the President may direct. The contract shall be certified by some person appointed for that purpose by the President, but shall not be valid 'til the Pesident approves the same. A title shall be given by the United States, on the completion of the payment.

Article IV. At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor, in fee simple, from the United States.

Article V. All intruders upon the country hereby ceded, shall be removed therefrom, in the same manner as intruders may be removed by law, from other public land, until the country is surveyed, and the selections made; excepting however, from this

teen hundred and thirty-six, and to the declaration
there was a plea of, "not guilty."

On the trial of the cause, Spring term eighteen
hundred and thirty-seven, the defendants in error,
offered in evidence, in support of their action, a
deed from Benjamin Marshall, James Islands, Oseo-
let Fixico and William M'Gilvery, dated the twenty-
sixth day of October, eighteen hundred and thity-
five, containing the following recitals.

"Whereas a treaty between the United States

---

provision, those white persons who have made their
own improvements, and not expelled the Creeks
from theirs. Such persons may remain 'til their
crops are gathered. After the country is surveyed
and the selections made, this article shall not oper-
ate upon that part of it, not included in such selec-
tions. But intruders shall, in the manner before de-
scribed, be removed from these selections, for the
term of five years, from the ratification of this
treaty, or until the same are conveyed to white
persons.

Article VI. Twenty-nine sections in addition to
the foregoing, may be located, and patents for the
same, shall then issue to those persons, being
Creeks, to whom the same may be assigned by the
Creek tribe. But whenever the grantees of these
tracts possess improvements, such tracts shall be
so located as to include the improvements, and as
near as may be, in the centre. And there shall
also be granted, by patent, to Benjamin Marshall,
one section of land, to include his improvement on
the Chattahoochee river, to be bounded for one
mile, in a direct line, along the said river, and to
run back for quantity. There shall also be grant-

of America and the Creek tribe of Indians, was made and concluded at the city of Washington, on the twenty-fourth day of March, in the year of our Lord, one thousand eight hundred and thirty-two; and by the second article of said treaty, after the general cession of the lands of said tribe, East of the Mississippi, certain parcels of land were allowed and reserved to the principal chiefs and heads of families of said tribe. And also, further, by the first part of the sixth article of said treaty, other

---

ed to Joseph Bruner, a colored man, one half section of land, for his services as an interpreter.

Article VII. All the locations authorised by this treaty, with the exception of that of Benjamin Marshall, shall be made in conformity with the lines of the surveys; and the Creeks relinquish all claim for improvements.

Article VIII. An additional annuity of twelve thousand dollars, shall be paid to the Creeks for the term of five years, and thereafter the said annuity, shall be reduced to ten thousand dollars, and shall be paid for the term of fifteen years. All the annuities due to the Creeks, shall be paid in such manner as the tribe may direct.

Article IX. For the purpose of paying certain debts due by the Creeks, and to relieve them in their present distressed condition, the sum of one hundred thousand dollars, shall be paid to the Creek tribe, as soon as may be, after the ratification hereof, to be applied to the payment of their just debts; and then to their own relief, and to be distributed as they may direct, and which shall be in full consideration of all improvements.

Article X. The sum of sixteen thousand dollars shall be allowed as a compensation to the delega-

5 P.          53.

lands were allowed to said tribe, in the words following, viz: "Twenty-nine sections, in addition to the foregoing, may be located, and patents for the same shall then issue to those persons being Creeks, to whom the same may be assigned by the Creek tribe." And whereas, at a general council of said nation, and of the principal chiefs and head men of the nation assembled, began and held, at the house of Peter Dudley, Esq. in the county of Tallapoosa, on the second day of October, in the year of our

tion sent to this place, and for the payment of their expenses, and of the claims against them.

Article XI. The following claims shall be paid by the United States.

For ferries, bridges and causeways, three thousand dollars, provided the same shall become the property of the United States.

For the payment of certain judgments obtained against the Chiefs, eight thousand five hundred and seventy dollars.

For losses; for which they suppose the United States responsible, seven thousand seven hundred and ten dollars.

For the payment of improvements, under the treaty of 1826, one thousand dollars.

The three following annuities shall be paid for life.

To Tuske-hew-haw-Cusetaw, two hundred dollars.

To the Blind Uchu King, one hundred dollars.

To Neah Mico, one hundred dollars.

There shall be paid the sum of fifteen dollars, for each person who has emigrated without expense to the United States, but the whole sum al-

Lord, one thousand eight hundred and thirty-five; by virtue of the right and power, in said tribe, by the last mentioned article of the treaty aforesaid, vested, the said tribe relinquished, released, assigned over and conveyed, unto Benjamin Marshall, James Islands, William M'Gilvery and Oseolet Fixico, of said tribe, all their right, title, property and interest in and to, twenty-three sections and one half, of said twenty-nine sections, allowed and located as aforesaid." &c.

---

lowed under this provision, shall not exceed fourteen hundred dollars.

There shall be divided among the persons, who suffered in consequence of being prevented from emigating, three thousand dollars.

The land hereby ceded, shall remain as a fund from which all the foregoing payments, except those in the ninth and tenth articles, shall be paid.

Article XII. The United States are desirous that the Creeks should remove to the country West of the Mississippi, and join their countrymen there, and for this purpose it is agreed, that as fast as the Creeks are prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new homes—Provided, however, that this article shall not be construed, so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.

Article XIII. There shall also be given to each emigrating warrior, a rifle, moulds, wiper and ammunition, and to each family, one blanket. Three thousand dollars, to be expended as the President

The conveyance then goes on to mention the number, &c. of the sections, and includes section twenty-six, township fourteen, range eight, the South-west qurrter of which is sued for; after which follows the *habendum*, to William M'Gehee and John H. Thomas; covenants of warranty, and that the grantors were authorised by the assignment from the Creek tribe, to convey, &c. The consideration was thirty-three thousand dollars in hand paid. The deed was signed, sealed and delivered

---

may direct, shall be allowed for the term of twenty years, for teaching their children. As soon as half their people emigrate, one blacksmith shall be allowed them, and another when two-thirds emigrate, together with one ton of iron and two hundred weight of steel, annually, for each blacksmith.— These blacksmiths shall be supported for twenty years.

Article XIV. The Creek country West of the Mississippi, shall be solemnly guaranteed to the Creek Indians, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them. And the United States, will also defend them from the unjust hostilities of other Indians, and will also, as soon as the boundaries of the Creek country, West of the Mississippi are ascertained, cause a patent or grant to be executed to the Creek tribe, agreeably to the third section of the act of Congress of May 2d, 1830, entitled, "An act to provide for an exchange of lands with the Indians; residing in any of the

in the presence of H. G. Barclay, R. D. Roland and John B. Hogan, subscribing witnesses.

The deed contained a certificate from the clerk of the County Court of Benton county, that it was filed and duly recorded in his office.

The following is the affidavit, upon which, it appears to have been admitted to record:

"State of Alabama, } ss.
    Benton county. }

Personally appeared before me, M. M. Houston,

---

States or Territories, and for their removal West of the Mississippi"

Article XV. This treaty shall be obligatory on the contracting parties, as soon as the same shall be ratified by the United States.

In testimony whereof, the said Lewis Cass, and the undersigned Chiefs of the said tribe, have hereunto set their hands, at the city of Washington, this 24th day of March, A. D. 1832.

|                          |              |
|--------------------------|--------------|
| LEWIS CASS,              |              |
| Opothleholo,             | his x mark.  |
| Tuchebatcheehadgo,       | his x mark.  |
| Efiematla,               | his x mark.  |
| Tuchebatche Micco,       | his x mark.  |
| Tomack Micco,            | his x mark.  |
| William McGilvery.       | his x mark.  |
| Benjamin Marshall.       |              |

In the presence of Samuel Bell, William R. King, John Tipton, William Wilkings, C. C. Clay, J. Speight, Samuel W. Mardis, J. C. Isacks, John Crowell, I. A.

Benjamin Marshall, }
Thomas Carr,       } *Interpreters.*
John H. Brodnax.   }

clerk of the County Court of Benton county, aforesaid, R. D. Roland, one of the subscribing witnesses to the foregoing deed of conveyance, from B. Marshall, and others, to William M'Gehee and John H. Thomas, and made oath, that he saw the same, signed, sealed and delivered, for the purposes therein mentioned, and that Hugh G. Barclay, and John B. Hogan, signed the same, at the time said deed was executed, as witnesses. Given under my hand, &c."

The plaintiff in error objected to the admission of this deed in evidence, because:

1. The deed was not so authenticated, as to authorise it to be read, without further proof.

Now, THEREFORE, BE IT KNOWN, That I, Andrew Jackson, President of the United States of America; having seen and considered said treaty, do, in pursuance of the advice and consent of the Senate, as expressed by their resolution of the second of April, one thousand eight hundred and thirty-two, accept, ratify and confirm the same, and every clause and article thereof.

*In Testimony whereof,* I have caused the seal of the United States to be hereunto affixed, having signed the same with my hand.

Done at the city of Washington, this fourth day of April, in the year of our Lord, one [L. S.] thousand eight hundred and thirty-two, and of the Independence of the United States, the fifty-sixth.

ANDREW JACKSON.

By the President.
Edw. Livingston,
*Secretary of State.*

2. There was no evidence to shew that grantors had any estate to convey.

3. There was no evidence aside from the recitals contained in the deed, to shew that the Creek tribe had made to the grantors the assignment, contemplated in the sixth article of the treaty, made between the tribe and the Untied States, under which they claimed.

The Court ruled, that defendants in error might commence their proof of title, with the conveyance to them, but that, nevertheless, they would be bound to trace it to its source, as the deed offered did not amount to a complete title: That this question only involved the course of proof, and defendants in error might commence at either end of the chain of title. But the deed was permitted to be read, solely as evidence of a conveyance from grantors to defendants in error, and not as evidence of any of its recitals; for proof of which the Court charged expressly, it was wholly insufficient. Under these views, the deed was read to the jury, notwithstanding the objections of plaintiff in error.

A patent was then offered in evidence, from the government of the United States, to James Islands, and the other grantors, in the deed before mentioned, for the lands to which this action applies, which patent was as follows:

"The United States of America:
"To all whom these presents shall come, greeting.

"Whereas, under the sixth article of the treaty, made and concluded at the city of Washington, on the twenty-fourth day of March, in the year of our Lord, one thousand eight hundred and thirty-two,

between the United States and the Creek tribe of
Indians,—by which it was provided, that twenty-
nine sections should be located, and patents for the
same be issued, to those persons, being Creeks, to
whom the same might be assigned by the Creek
tribe.   The chiefs and head men of the said tribe, in
council, on the seventh day of October, in the year
of our Lord, one thousand eight hundred and thirty-
five, assigned to James Islands, William M'Gilvery,
Benjamin Marshall, Oseolet Fixico, of the said
tribe, section twenty-six, in township fourteen, of
range eight, containing six hundred and twenty
acres, in the Coosa land district, in the State of Ala-
bama as being one of the sections to which the
said tribe was entitled, under the said sixth article;
and that assignment having been approved by the
President of the United States, on the sixteenth
day of April, in the year of our Lord, one thousand
eight hundred and thirty-six:   NOW KNOW YE, that
there is therefore granted by the United States, unto
the said James Islands, William M'Gilvery, Ben-
jamin Marshall, and Oseolet Fixico, and to their
heirs and assigns forever, the tract of land above
described, to have and to hold the said tract, with
the appurtenances, unto the said James Islands,
William M'Gilvery, Benjamin Marshall and Ose-
olet Fixico, and to their heirs and assigns, forever.

"In testimony whereof, I, Andrew Jackson, Pre-
sident of the United States, have caused these let-
ters to be made patent, and the seal of the General
Land Office to be hereunto affixed.

"Given under my hand, at the city of Washing-
ton, on the eighteenth day of November, in the

year of our Lord, one thousand eight hundred and thirty-six, and of the independence of the United States, the sixty first.

By the President,

ANDREW JACKSON.

A. J. DONELSON, Sec'ry.

Recorded, vol. 1st, P. 2. ⎰
    Creek Patents.       ⎱

HOPSON M. GARLAND, Recorder
of the General Land Office,"

This patent was objected to by the plaintiff in error,—

1. Because its date was long subsequent to the commencement of the action. The action was commenced on the twenty-sixth day of April, eighteen hundred and thirty-six, and the patent offered, bore date the eighteenth day of November of the same year.

2. Because there was no evidence which coupled it with the deed first above mentioned.

The Court overruled the objections, and the patent was read to the jury.

The Court charged, that the patent was sufficient evidence of the assignment to Islands, and the other grantors in the deed first above recited, and that the patent and deed together, formed a sufficient title to enable defendants in error, to recover, if the jury were satisfied from the other proof, that plaintiff in error was in possession.

The jury returned a verdict for the plaintiffs below, and assessed their damage, at seventy-five dollars.

5 P.        54

The bill of exceptions stated, that on the trial of the cause, the plaintiffs, as one link in their chain of title, offered in evidence, a deed, the copy of which, with its authentications, were annexed to the bill, and made part of it: That its introduction was objected to by defendant.

First,—Because it was not so authenticated as to authorise it to be read without further proof.

Secondly,—Because there had been no evidence to shew that the grantors, had any estate to convey; and

Thirdly—Because there was no evidence, aside from the recitals in the deed, to shew that the Creek tribe had made to the grantors, the assignment contemplated in the sixth article of the treaty, made between said tribe and the United States, under which article they claimed.

The presiding Judge ruled, that the plaintiffs would not be restricted from commencing their proof of title, with the conveyance to the plaintiffs: But that they, nevertheless, would be bound to trace it to its source, as the deed proposed, did not amount to a complete title: That the objections only involved the course of proof, and so the plaintiffs might commence at either end of their chain of title. The deed was permitted to be read, alone as evidence of a conveyance from the grantors to plaintiffs, and not as evidence of its recitals,—for proof of which it was expressly charged to be wholly insufficient. With these views, the deed was permitted to be read to the jury, although objected to by the defendant.

The bill further stated, that plaintiffs then offer-

ed in evidence, a patent from the government of the United States, to James Islands and others, grantors in the deed before mentioned, for the lands sought to be recovered in the action. A copy of the patent is annexed to the bill, and makes part of it, and is the same as already set forth: That defendent objected to the reading of the patent, on the ground that its date was long subsequent to the commencement of the action, and because there was no evidence that coupled it with the deed: That the Court overruled the objections, and the patent was read to the jury:

That the Court had charged the jury, that the patent was sufficient evidence of the assignment to M'Gilvery, and the other obligors in the deed just above recited; and that the patent and deed together, formed a sufficient title to enable the plaintiffs to recover, if the other proof satisfied them, that the defendant was in possession, &c.

To the charge as to the influence of the patent, and as to the deed seperately, forming a sufficient title to authorise a recovery, the bill stated, the defendant excepted, and as to all the matters above set forth.

*Martin* for plaintiff in error. *Chilton*, contra:

GOLDTHWAITE, J.—On the trial of this cause, the defendants in error, offered the following evidence of title to support their action:

First,—A deed from Benjamin Marshall, James Islands, Oseolet Fixico and William M'Gilvery, dated, twenty-sixth of October, eighteen hundred

and thirty-five, conveying to them, the land, the subject of controversy. This deed recites, that by virtue of the treaty of the twenty-fourth of March, eighteen hundred and thirty-two, twenty-nine sections of land, out of the country ceded, might be located, and patents for the same, should be issued to those persons, being Creeks, to whom the same should be assigned by the Creek tribe: That at a general council of the Creek nation, and of the chiefs and head-men of the nation, assembled at the house of Peter Dudley, on the *second day of October, eighteen hundred and thirty-five*, the said tribe, by virtue of the power in them vested by the treaty, relinquished, released, assigned over, and conveyed, to Benjamin Marshall, James Islands, William M'Gilvery and Oseolet Fixico, all their right, title, property and interest, in and to, twenty-three and a half sections, out of the twenty-nine, allowed and located, as aforesaid, designating twenty-three and a half sections by number, &c. among which is found the one the subject of this suit; after which follows the *habendum* to the defendants in error, and covenants of warranty of title, and that the grantors were authorised by the said assignment from the Creek tribe, to convey, &c.

The introduction of this deed was opposed by the plaintiffs in error, for several reasons:

1. Because it was not so authenticated, as to authorise it to be read in evidence without further proof.

2. Because there was no evidence to shew that the grantors had any title to convey.

3. Because there was no evidence aside from th:

recitals of the deed, to shew that the Creek tribe had made to the grantors the assignment contemplated by the treaty of eighteen hundred and thirty-two.

The presiding Judge ruled, that the defendants in error, would not be restricted from commencing the proof of title, with the conveyance to them, but they would nevertheless be bound to trace their title to its source,—the deed not amounting to a complete title:—That this question only involved the course of proof, and so the defendants in error might commence at either end of their chain of title. The deed was permitted to be read, alone as evidence of conveyance, from the grantors therein named, to the defendants in error, and not as evidence of any of its recitals; for proof of which, it was charged to be wholly insufficient. With these views, the deed was allowed to be read to the jury, notwithstanding the objection of the plaintiff in error.

Second.—A patent from the United States to the grantors in the said deed, for the section of land sued for, dated eighteenth of November, eighteen hundred and thirty-six, which patent recites, that under the sixth article of the treaty of eighteen hundred and thirty-two, it was provided that twenty-nine sections of land should be located, and patents for the same should be issued to those persons, being Creeks, to whom the same might be assigned by the Creek tribe. That the chiefs and head men of the said tribe, in council, on the seventh day of October, eighteen hundred and thirty-five, assigned to James Islands, William M'Gilvery,

Benjamin Marshall and Oseolet Fixico, of the said tribe, the section of land in dispute, as one of the sections to which the said tribe was entitled, under the sixth article of the treaty, and that the said assignment having been approved by the President of the United States, on the sixteenth of April, eighteen hundred and thirty-six, there was granted, &c.

The introduction of this patent, was opposed for the reasons:

1. Because it bore date subsequent to the institution of this suit.

2. Because no evidence coupled the deed with the patent.

These objections were overruled, and the patent read in evidence to the jury.

The Court charged, that the patent was sufficient evidence of the assignment to M'Gilvery, and the other grantors in the deed, given in evidence; that the patent and deed together formed a sufficient title, to enable the defendants in error to recover, if the other proof satisfied them, that the plaintiff in error, was in possession.

The admission of this evidence, and the charge given, were excepted to by the plaintiff in error, and the questions arising thereon, have now to be examined by this Court. They may be considered in the following order.

1. The correctness of the charge of the Court on the title, exhibited by the deed and patent introduced.

2. The objection to the introduction of the patent.

3. The objection to the introduction of the deed.

FIPPS *vs* M'GEHEE, et al

The title of the defendants in error, has its inception in the sixth article of the treaty of eighteen hundred and thirty-two, with the Creek tribe of Indians, which article is as follows:

"Twenty-nine sections, in addition to the foregoing, may be located, and patents for the same, shall then issue, to those persons, being Creeks, to whom the same may be assigned by the Creek tribe. But whenever, the grantees of these tracts, possess improvements, such tracts shall be so located, as to include the improvements, as near as may be, in the centre."

If this article was to be construed, without considering the previous provisions of the treaty, or without a particular examination of its phraseology, a serious doubt might be entertained, whether any legal estate was intended to be created, in those sections of land, before the issuing of a patent. But there is an evident intention, pervading the whole treaty, that the Indian reservees, of whatever description, (and there are several,) were intended to be put in possession, before the granting of any evidence of title, by patent, or any written evidence, equivalent thereto; and that this possesssion was intended to be protected against all intrusion. So, likewise, it is evidently contemplated, that after a reservation is designated by location, the individual Indian entitled to the same, might apply to the officers of the government, and be placed, by the strong arm of power, in the actual. possession of his lands. To deny to the peaceful action of Courts of law, a power which has been claimed to be exercised, on a summary application,

by an executive officer of the government, would present a solecism, which we are not disposed to admit. Thus, the fifth article of the treaty provides, "that all intruders upon the country hereby ceded, shall be removed therefrom, in the same manner as intruders may be removed, by law, from other public lands, until the country is surveyed, and the selections made; excepting however from this provision, those white persons, who have made their own improvements, and not expelled the Creeks from theirs: such persons may remain until their crops are gathered: *after the country is surveyed, and the selections made, this article shall not operate upon that part not included in such selections.— But intruders, shall, in the manner before described, be removed from these selections, for the term of five years, from the ratification of this treaty, or until conveyed to white persons.*

The portions of this article which are italicised, clearly show, that it was contemplated by the parties to the treaty, that there might be an immediate occupation of a reservation, although not before settled, and that it was the duty of the government to place the Indian entitled in possession, if required. This, in our opinion, created an inchoate legal title, capable of being enforced in a court of law— and this title attached immediately on location.

No mode, it is true, is designated by the treaty, by which the locations are to be ascertained and allotted; but it follows, *ex necessitate rei,* that the power which is required by the terms of the treaty, to place the reservee in possession, must have the right to determine where the individual shall be allotted.

The sixth article of the treaty quoted above, is not worded with accuracy. It uses the term grantees in the same sense as assignees. "Whenever, (is the expression,) the grantees of these tracts possess improvements, such tracts shall be so located, as to include the improvements, as near as may be, in the centre." All grants must designate the land granted under our system of surveys, (which is recognised by the treaty,) and consequently no location could be made *after* a grant. The location should precede it.

So, it is conceived, the assignment to, or designation of the individual, who is to have one or more of the sections reserved by this article, should precede the location, and whenever these two acts, have taken place, to wit, the designation of the individual, by assignment from the tribe, and his location by the proper officer of the government, or a location first, and an assignment afterwards,—the legal inchoate title attaches, which is made complete by patent from the United States.

If the grantors in the deed, introduced by the defendants in error, had received an assignment from the Creek tribe, and had been located on the land in question; or if the land had been located and designated as reserved for this purpose, by the locating agent, and *then* assigned *before* the commencement of suit, to the said grantors, the right of the defendants in error, could not be gainsayed, but under the decision, made in the case of *Jones & Parsons'* heirs *vs Inge* and *Mardis'* heirs, (see ante this volume, page 327,) the patent having been issued after the suit was instituted, could not by relation,

5 P, 55.

extend back so as to support the action, and there was, therefore, no title in evidence, to support the action.—*Downey vs Gallagher*, 2 Sergt. & R. 455.

If the authentication of the deed, was such as to authorise it to be read in evidence, it was properly enough admitted, as evidence of a conveyance to the defendants in error; and for the reasons stated by the Court, it was not its province to direct the particular manner in which the title should be introduced before the jury.

But in deciding that the certificate endorsed on the deed, was sufficient to warrant its introduction, the Court fell into a manifest error.

The act of eighteen hundred and twelve, (Aikin's Dig. 89.) which prescribes the mode in which the probate of deeds may be taken, sets out a form, of which the substance must be pursued. It requires the witness to swear to the subscription of all the parties setting out their names,—that the witnesses subscribed in the presence of the maker of the deed, and in presence of each other,—and on the day and year named in the deed. The last of these requisites is certainly, a most material one, as it presents the only check against an ante-dated deed, being admitted to probate, as genuine. No suspicion attaches to the present case, but inasmuch as the certificate shewn, is fatally defective, in all these particulars, it should not have been admitted, without proof of its execution.

It follows from these views, that the judgment rendered below, was erroneous, and must be reversed; and if desired, the cause will be remanded.

HOPKINS, C. J, not sitting.